UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHARLES ERWIN,<br><br>　　　　　　　　　　Plaintiff,<br><br>v.<br><br>CITIBANK, N.A.,<br><br>　　　　　　　　　　Defendant. | Case No.: 3:16-cv-03040-GPC-KSC<br><br>**ORDER:**<br><br>**(1) DENYING WITHOUT PREJUDICE DEFENDANT'S MOTION TO COMPEL ARBITRATION; AND**<br><br>**(2) GRANTING 60 DAYS LEAVE TO TAKE LIMITED DISCOVERY**<br><br>**[ECF No. 5.]** |

  Before the Court is Defendant Citibank, N.A.'s ("Defendant's" or "Citibank's") motion to compel Plaintiff Charles Erwin ("Plaintiff") to arbitrate his claims in this action on an individual, non-class basis, and to stay the instant action pending the outcome of arbitration proceedings. (Dkt. No. 5.) The motion has been fully briefed. (Dkt. Nos. 7, 9.) The Court deems this motion suitable for disposition without oral argument pursuant to Civil Local Rule 7.1(d)(1). Having reviewed the parties' arguments and the applicable law, the Court **DENIES WITHOUT PREJUDICE** Defendant's motion to compel

1

arbitration and **GRANTS** the parties 60 days leave to take limited discovery regarding the threshold question of Plaintiff's opt-out.

## BACKGROUND

### A. Plaintiff's Complaint

Plaintiff Charles Erwin opened a consumer credit card account with Defendant Citibank, N.A. (Dkt. No. 1-2, Compl. ¶ 14.) A Citibank Simplicity credit card account ("Account") was issued to Plaintiff on or about May 22, 2014. (Dkt. No. 5-2, Booth Decl. ¶ 4.) At some point in 2015, Plaintiff fell behind on his credit card payments. (Dkt. No. 1-2, Compl. ¶ 15.) Plaintiff alleges that Citibank began calling him "numerous times" every day to collect the debt, amounting to "hundreds of calls in a matter of weeks." (*Id.*) Plaintiff alleges that the calls caused him "stress and anxiety," which in turn "affected his work." (*Id.* ¶ 16.) Plaintiff informed Citibank that he refused to pay the debt, on account of Citibank's repeated calls to Plaintiff. (*Id.*)

Plaintiff alleges that Citibank "used an automated dialer to telephone Plaintiff," and that when Plaintiff picked up, or when Citibank left a message for Plaintiff, "Plaintiff was played a recording with an artificial, pre-recorded voice," requesting that Plaintiff return Citibank's call during a specified time period. (*Id.* ¶ 17.) Citibank made calls to Plaintiff's home, cell, and work phones, even after Plaintiff demanded that the calls cease. (*Id.* ¶¶ 18, 20.)

On October 3, 2016, Plaintiff filed a Complaint against Citibank in the Superior Court of the State of California for the County of San Diego, asserting a claim for violation of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227, *et seq.*, and state law claims for violation of California's Rosenthal Fair Debt Collection Practices Act, Cal. Civ. Code § 1788, *et seq.*, invasion of privacy, negligence, and intrusion upon seclusion. (Dkt. No. 1-2.) Defendant removed the instant action to federal court on December 16, 2016. (Dkt. No. 1.)

Citibank filed the instant motion on January 26, 2017. (Dkt. No. 5.)

////

### B. The 2014 and 2015 Arbitration Agreements

At the time Plaintiff's Account was opened in May 2014, Plaintiff was mailed the Card Agreement, which contains the written terms and conditions governing the use of the Account, including a choice-of-law provision calling for the application of federal and South Dakota law, and the Arbitration Agreement. (Dkt. No. 5-2, Booth Decl. ¶¶ 5–6l; Dkt. No. 5-3 at 13.) The Card Agreement specifies that the Agreement comprises the contract between Plaintiff and Citibank regarding the Account, and that the contract applies if Plaintiff uses or authorizes use of the card, or if he does not close the account within thirty days of the card's issuance. (Dkt. No. 5-3 at 10.) The Card Agreement authorizes Citibank to change the terms of the Agreement, and notifies cardholders that Citibank will provide "advance written notice of the changes and a right to opt out, to the extent required by law." (*Id.*) It is undisputed that after opening the Account, Plaintiff used the card. (*See* Dkt. No. 1-2, Compl. ¶¶ 14–15; Dkt. No. 5-2, Booth Decl. ¶ 7; Dkt. No. 5-3 at 18–22.) The 2014 Arbitration Agreement stated, in pertinent part: "You or we may arbitrate any claim, dispute or controversy between you and us (called "Claims"). All Claims (whether based on contract, tort, state, or any other basis) arising out of or related to your account, a previous related account or our relationship may be arbitrated." (Dkt. No. 5-3 at 13.)

However, on September 10, 2015, Citibank mailed Plaintiff a new Card Agreement for the Account, along with a cover letter ("Cover Letter") and an explanation of changes to the Card Agreement ("Summary"). (Dkt. No. 5-2, Booth Decl. ¶ 8; Dkt. No. 5-3 at 24–41.) Plaintiff was advised that the new Card Agreement, as well as the changes detailed in the Cover Letter and Summary, would be effective on November 14, 2015. (*Id.*) The new terms included changes to the Arbitration Agreement. (Dkt. No. 5-4 at 24.) In particular, the new terms gave Plaintiff the choice to opt-out of the arbitration provision:

> You have the right to reject the change to arbitration. If you reject this change, your account will no longer be subject to an arbitration provision. You can reject

> the change to arbitration by writing to us at PO Box 6195, Sioux Falls, SD 57117-6195 stating that you would like to reject the arbitration provision. Your letter must be postmarked on or before 11/14/2015. We will not close your account if your reject this change.

(*Id.* at 26.) Plaintiff had the right to reject only the change to arbitration, and could not reject any other changes in the new Card Agreement. (*Id.*)

Plaintiff asserts in a declaration that on or about October 28, 2015, he mailed an opt-out letter pursuant to Citibank's instructions, by first class mail, with proper postage prepaid, addressed to Citibank's stated address, and deposited it in a United States Postal Mailbox. (Dkt. No. 7-1, Erwin Decl. ¶¶ 4–5.) The letter was not returned to Plaintiff as undeliverable. (*Id.* ¶ 6.) Plaintiff attached a copy of the text of his letter to his declaration. (Dkt. No. 7-2 at 3.)

Citibank asserts that it never received Plaintiff's opt-out letter. (Dkt. No. 9-1, Supp. Booth Decl. ¶ 4.) In support of its assertion, Citibank provides a declaration by Kelly Booth, an employee with access to Citibank's business records relating to credit card accounts issued by Citibank. (*Id.* ¶¶ 1–2.) Booth describes Citibank's policy and procedure for handling a cardmember's request to reject the arbitration agreement. (*Id.* ¶¶ 6–11.) Upon Citibank's receipt of an opt-out letter, the written request is scanned into Citibank's system. (*Id.* ¶ 8.) Citibank's practice is to retain a scanned image of the opt-out letter for ten years in the system, and retain a physical copy for 180 days. (*Id.*) Receipt of an opt-out letter triggers a process wherein Citibank's Account Maintenance Team employees review whether an opt-out request had previously been recorded on the account. (*Id.* ¶¶ 9–10.) If account records indicate that no opt-out requests have previously been recorded, the employee initiates the opt-out request in the account maintenance system. (*Id.*) Once the rejection request is initiated in the system, the system will determine if the arbitration opt-out request was timely received, before determining whether or not the arbitration rejection was successful. (*Id.* ¶ 11.) A confirmation letter is sent to the customer, regardless of whether the arbitration opt-out is

granted. (*Id.*) Booth asserts that Citibank's document management system does not contain the letter Plaintiff attached to his declaration. (*Id.* ¶¶ 12–13.) Rather, Citibank's system has a record only of Plaintiff's September 30, 2016 letter requesting that Citibank stop calling him. (*Id.*; *see also* Dkt. No. 9-2 at 3.) Booth additionally asserts that no arbitration opt-out case was created on Plaintiff's account, that there is no systemic note regarding a successful or unsuccessful request to opt-out, and that there is no indication a confirmation letter was sent. (*Id.* ¶¶ 14–16.)

## LEGAL STANDARD

Pursuant to the Federal Arbitration Act ("FAA"), arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds that exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The FAA provides that "a party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court . . . for an order directing that . . . arbitration proceed in the manner provided for in such agreement." 9 U.S.C. § 4. Federal policy favors arbitration. *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983). The FAA "establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Id.* at 24–25.

However, notwithstanding the above, "question[s] of arbitrability," including "certain gateway matters," are "presumptively for courts to decide," *Oxford Health Plans LLC v. Sutter*, 133 S. Ct. 2064, 2068 n.2 (2013); *see also Momot v. Mastro*, 652 F.3d 982, 987 (9th Cir. 2011) (clarifying that issues that "contracting parties would likely have expected a court to have decided"—such as "whether the parties have a valid arbitration agreement or are bound by a given arbitration clause, and whether an arbitration clause in a concededly binding contract applies to a given controversy"—are "gateway questions of arbitrability" to be determined by the court, not the arbitrator); *Mohamed v. Uber Techs., Inc.*, 848 F.3d 1201, 1208 (9th Cir. 2016) ("[T]here is a presumption that courts

will decide which issues are arbitrable; the federal policy in favor of arbitration does not extend to deciding questions of arbitrability.").

In ruling on a motion to compel arbitration, a court must determine two such "gateway matters": (1) whether there is an agreement to arbitrate between the parties; and (2) whether the agreement covers the dispute." *Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015) (citing *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84 (2002)). If these conditions are satisfied, the court lacks discretion to deny the motion and must compel arbitration. 9 U.S.C. § 4; *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985) ("By its terms, the [FAA] leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration."). In addition, Section 3 of the FAA provides that once a court compels arbitration, the court "shall on application of one of the parties stay the trial of the action" until arbitration has occurred. 9 U.S.C. § 3. However, "[i]f the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue, the court shall proceed summarily to the trial thereof." 9 U.S.C. § 4.

## DISCUSSION

Before the Court may compel the parties to arbitration, the Court must first determine the gateway questions of arbitrability: (1) whether there is an agreement to arbitrate between the parties; and (2) whether the agreement covers the dispute.[1] *See Brennan*, 796 F.3d at 1130. Plaintiff contends that there is a genuine issue of material fact as to whether an agreement to arbitrate even exists, given his alleged election to opt out of the 2015 Arbitration Agreement. (*See* Dkt. No. 7 at 10–12.) Defendant contends

---

[1] In ruling on a § 3 "application for a stay while the parties arbitrate, a federal court may consider only issues relating to the making and performance of the agreement to arbitrate," *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 403–04 (1967), while "a challenge to the validity of the contract as a whole, and not specifically to the arbitration clause, must go to the arbitrator," *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 449 (2006). Here, the parties do not dispute the validity of the 2015 Card Agreement as a whole—rather, the dispute solely involves the arbitration provisions within the Card Agreement.

that the dispute over whether Plaintiff successfully invoked his right to opt out of arbitration is *itself* subject to arbitration, under the 2014 Arbitration Agreement. (*See* Dkt. No. 9 at 3–6.) Plaintiff's argument dovetails with the first gateway question of arbitrability, whereas Defendant's argument amounts to a contention that the 2014 Arbitration Agreement covers the instant dispute.

First, although Defendant contends that the 2014 Arbitration Agreement applies to the instant dispute, (Dkt. No. 9 at 2), the new terms of the 2015 Card Agreement, including the new Arbitration Agreement terms, took effect on November 14, 2015, (Dkt. No. 5-3 at 24). Once the 2015 Arbitration Agreement terms took effect, they superseded the 2014 terms; Defendant has not provided any support indicating the contrary. Plaintiff's election to opt out thus begs one question only—whether the *2015* Arbitration Agreement applies to him.

Second, whether or not Plaintiff opted out of the 2015 Arbitration Agreement is dispositive of the first gateway question of arbitrability—it goes to the very heart of whether an agreement to arbitrate exists. If Plaintiff opted out, as he alleges, the superseding terms of the 2015 Arbitration Agreement do not apply to Plaintiff, and Plaintiff and Defendant do not have an agreement to arbitrate. If Plaintiff did not opt out, Plaintiff is bound to arbitrate under the terms of the 2015 Arbitration Agreement. Indeed, it is "well settled" that whether the parties have agreed to arbitrate a particular dispute is typically an issue for judicial determination, as is a dispute over an arbitration contract's formation. *See Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 296–97 (2010). Requiring Plaintiff to arbitrate where he denies entering into the 2015 Arbitration Agreement "would be inconsistent with the 'first principle' of arbitration that 'a party cannot be required to submit [to arbitration] any dispute which he has not agreed so to submit.'" *Three Valleys Mun. Water Dist. v. E.F. Hutton & Co.*, 925 F.2d 1136, 1142 (9th Cir. 1991) (quoting *AT & T Technologies, Inc. v. Communications Workers*, 475 U.S. 643, 648 (1986)) (reversing district court's order directing arbitration and remanding

for determination the gateway question of "whether the signatory had authority to bind the other plaintiffs to the agreements containing the arbitration clauses").

Moreover, even if the 2014 Arbitration Agreement governs the instant dispute, there is no clear and unmistakable evidence that the parties agreed to arbitrate questions of arbitrability. The Supreme Court has observed that

> [t]he law treats silence or ambiguity about the question "*who* (primarily) should decide arbitrability" differently from the way it treats silence or ambiguity about the question "*whether* a particular merits-related dispute is arbitrable because it is within the scope of a valid arbitration agreement"—for in respect to this latter question the law reverses the presumption.

*First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944–45 (1995). "Although gateway issues of arbitrability presumptively are reserved for the court, the parties may agree to delegate them to the arbitrator." *Momot*, 652 F.3d at 987. Applying federal arbitrability law,[2] the Court notes that a "more rigorous standard" applies "in determining whether the parties have agreed to arbitrate the question of arbitrability"—that is, "the question of arbitrability is left to the court unless the parties clearly and unmistakably provide otherwise." *Id.* at 987–88. To evaluate whether clear and unmistakable evidence exists, courts may examine a course of conduct demonstrating assent, or look to the terms of the agreement to ascertain an express agreement to do so. *See id.*

Here, there is no clear and unmistakable evidence from the parties' course of conduct that they agreed to arbitrate arbitrability—rather, Plaintiff's conduct has indicated the contrary. Nor does the language of the Arbitration Agreement clearly and

---

[2] The 2014 Agreement states that "[f]ederal law and the law of South Dakota govern this Agreement." (Dkt. No. 5-3 at 13; *see also* Dkt. No. 5-3 at 39 (maintaining substantially the same language for the 2015 Agreement).) Because the contract does not clearly and unmistakably indicate that the parties agreed to apply non-federal arbitrability law, the Court applies federal arbitrability law here. *See Brennan*, 796 F.3d at 1129 (clarifying that absent clear and unmistakable evidence that the parties agreed to apply non-federal arbitrability law, the court is to make the arbitrability determination by applying the federal substantive law of arbitrability (internal citations and quotation marks omitted)).

unmistakably delegate to the arbitrator questions of arbitrability.[3]  *Compare* Dkt. No. 5-3 at 13 ("You or we may arbitrate any claim, dispute or controversy between you and us (called "Claims").  All Claims (whether based on contract, tort, state, or any other basis) arising out of or related to your account, a previous related account or our relationship may be arbitrated.") *with Momot*, 652 F.3d at 988 (concluding, based on the following language, clear and unmistakable intent to have arbitrators decide threshold questions of arbitrability: "If a dispute arises out of or relates to this Agreement, the relationships that result from this Agreement, the breach of this Agreement *or the validity or application of any of the provisions of this Section 4*, and, if the dispute cannot be settled through negotiation, the dispute shall be resolved exclusively by binding arbitration." (emphasis in original)).

Defendant next contends that Plaintiff's opt-out claim still fails, as (a) Plaintiff has not provided sufficient evidence to invoke presumption of receipt under the mailbox rule, and (b) that even if Plaintiff did so, Defendant has presented sufficient evidence to rebut the presumption of receipt.  (Dkt. No. 9 at 6.)  As to Defendant's first contention, the Ninth Circuit has stated, in a case Defendant itself cites to, (*see* Dkt. No. 9 at 8), "We have held a sworn statement is credible evidence of mailing for purposes of the mailbox rule," *Schikore v. BankAmerica Supplemental Ret. Plan*, 269 F.3d 956, 964 (9th Cir. 2001) (citing *Lewis v. United States*, 144 F.3d 1220, 1223 (9th Cir. 1998)); *see also Payan v. Aramark Mgmt. Servs. Ltd. P'ship*, 495 F.3d 1119, 1123 n.4 (9th Cir. 2007) (citing *Schikore* as an example of the Ninth Circuit "accepting a sworn statement that claimant mailed the requisite form [as] sufficient proof to presume receipt").  Here, Plaintiff has provided a similar sworn statement, outlining the composing, addressing, and mailing of his opt-out letter.  (Dkt. No. 7-1, Erwin Decl.)

---

[3] *See also* Dkt. No. 5-3 at 27 (maintaining substantially the same language in the 2015 Arbitration Agreement).

Defendant's fallback argument that it has presented sufficient evidence to rebut the presumption of receipt only serves to confirm that there is a genuine dispute of material fact regarding the mailing, receipt, and processing of Plaintiff's opt-out letter. Defendant avers simply that "there is no issue of fact," in light of its supplemental declaration stating that Citibank never received Plaintiff's letter. (Dkt. No. 9 at 10.) But factual issues do remain at this time—*e.g.*, whether Plaintiff's opt-out letter was lost or processed incorrectly *after* receipt by Citibank, the potential for error in Citibank's document management system, and whether Plaintiff has other concrete proof of mailing (such as a receipt, metadata, etc.). More importantly, Defendant has not provided any legal authority holding that a successful rebuttal of the presumption of receipt equates to a lack of a genuine dispute of material fact, or that a successful rebuttal negates the need to allow limited discovery and proceed summarily to trial. Indeed, the decisions cited by Defendant support the need to allow the parties to conduct expedited discovery, *see Pondexter v. Allegheny Cty. Hous. Auth.*, No. CIV.A. 11-857, 2012 WL 3611225, at *7–8 (W.D. Pa. Aug. 21, 2012) (concluding, at the summary judgment stage, that defendant rebutted plaintiff's mailbox rule presumption through "uncontroverted evidence," because plaintiff had not proffered any evidence, despite having conducted fact discovery), and to summarily proceed to trial, *see Legille v. Dann*, 544 F.2d 1, 4–7 (D.C. Cir. 1976) (reversing district court's grant of summary judgment and remanding case for trial, finding that district court was presented with an issue of material fact as to the date on which appellees' applications were received by the Patent Office).

As both parties acknowledge, the FAA requires the court to proceed summarily to trial on the issue of Plaintiff's opt out, the resolution of which is dispositive of whether an agreement to arbitrate exists. The Ninth Circuit, quoting the Third Circuit, has advised courts on how to proceed in light of a genuine factual dispute concerning the formation of an arbitration agreement:

> Before a party to a lawsuit can be ordered to arbitrate and thus be deprived of a day in court, there should be an express, unequivocal agreement to that effect. If there

is doubt as to whether such an agreement exists, the matter, upon a proper and timely demand, should be submitted to a jury. Only when there is no genuine issue of fact concerning the formation of the agreement should the court decide as a matter of law that the parties did or did not enter into such an agreement. The district court, when considering a motion to compel arbitration which is opposed on the ground that no agreement to arbitrate had been made between the parties, should give to the opposing party the benefit of all reasonable doubts and inferences that may arise.

*Three Valleys Mun. Water Dist.*, 925 F.2d at 1141 (quoting *Par–Knit Mills, Inc. v. Stockbridge Fabrics Co.*, 636 F.2d 51, 54 (3d Cir. 1980)).

Finally, the facts of this case are virtually indistinguishable from those in *Zemel v. Citibank*, No. 2:16-CV-03976 (WJM), 2016 WL 6139912 (D.N.J. Oct. 20, 2016). Defendant distinguishes *Zemel* by (1) asserting that Citibank did not argue in *Zemel*, as it does here, that the opt-out dispute should be submitted to an arbitrator, and (2) arguing that Defendant has offered "uncontroverted evidence" above and beyond that offered in *Zemel*. However, both attempts to distinguish the cases are unavailing. The Court has rejected the first argument for the reasons stated earlier, and Plaintiff has not had an opportunity to take discovery to contravene Defendant's evidence of non-receipt. Accordingly, this Court reaches a similar conclusion as that reached by the district court in *Zemel*—because genuine issues of fact concerning the making and existence of the agreement to arbitrate remain, the Court **DENIES WITHOUT PREJUDICE** Defendant's motion to compel arbitration and **GRANTS** the parties leave to take limited discovery on the question of Plaintiff's alleged opt-out.

## CONCLUSION

For the foregoing reasons, the Court **DENIES WITHOUT PREJUDICE** Defendant's motion to compel arbitration and **GRANTS** the parties 60 days leave to take limited discovery on the question of Plaintiff's opt-out. The parties are directed to contact the Magistrate Judge's chambers with any discovery management issues or concerns. Defendant may renew its motion to compel arbitration within five days of the conclusion of discovery. In the alternative, if Defendant elects not to renew its motion to

compel arbitration, Defendant is ordered to contact the undersigned's chambers within five days of the conclusion of discovery to schedule a pretrial conference.

**IT IS SO ORDERED.**

Dated:  March 20, 2017

Hon. Gonzalo P. Curiel
United States District Judge